IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SANDRA JEAN LAVAIR                                                                                      PLAINTIFF

V.                                           NO. 10-5074

MICHAEL J. ASTRUE,
Commissioner of Social Security                                                                  DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Sandra Jean LaVair, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (the Act) and Supplemental Security Income (SSI) under Title XVI of the Act. In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. §405(g).

**Procedural Background**

Plaintiff filed her applications for DIB and SSI on October 18, 2006, alleging disability since July 31, 2006, due to multiple chemical sensitivity, anxiety, depression, headaches, sleeplessness, chronic fatigue, muscle and joint pain, poor memory, and difficulty concentrating. (Tr. 54, 133). Plaintiff's applications were denied initially and upon reconsideration. (Tr. 54). Pursuant to Plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on August 11, 2008, where Plaintiff and a Vocational Expert (VE) appeared and testified. (Tr. 6-44). On October 14, 2008, the ALJ entered his decision denying Plaintiff's request for a determination of disability.

(Tr. 51-64). The ALJ found that the Plaintiff had the following severe impairments: Mood disorder/adjustment features; multiple chemical sensitivity; hypertension; and obesity. (Tr. 56). However, the ALJ found the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, and after careful consideration of the entire record, found that the Plaintiff had the residual functional capacity (RFC) to perform medium work as defined by 20 CFR 404.1567(c) and 416.967(c). The ALJ found:

> She must avoid exposure to strong chemicals but is able to frequently lift/carry twenty-five pounds, and occasionally fifty pounds, push and/or pull within the limits of lift/carry, sit (with normal breaks) for a total of about six hours in an eight hour work-day, and stand and/or walk (with normal breaks) for a total of about six hours in an eight hour work-day. She should work where the instructions are simple and non-complex; interpersonal contact with co-workers and the public is superficial and incidental to the work performed; the complexity of tasks is learned and performed by rote; the work is routine and repetitive; there are few variables; little judgment is required; and the supervision required is simple, direct, and concrete.

(Tr. 59). He found, with the assistance of the VE, that the Plaintiff would not be able to perform her past relevant work as a home health aid or housekeeper. (Tr. 35). He further found there were jobs in the national economy that Plaintiff could perform, such as a hand packer, or electronics assembler. The Plaintiff's request for review was denied by the Appeals Council on October 14, 2008, and the decision of the ALJ therefore became the final decision of the Commissioner. (Tr. 1-3).

**Evidence Presented**

Plaintiff was born in 1953 and completed the 12th grade. (Tr. 63, 132-137). Plaintiff was previously employed as a custodian for a retirement community, as a day cleaner in a supermarket, at Domino's Pizza, as a newspaper carrier, as a home health aid, and she had been a housekeeper with Dillard's for the last ten years. (Tr. 140).

Some time in 1984, Plaintiff was showering at a campground in New York. (Tr. 133). While

showering, the Plaintiff was exposed to large quantities of mosquito insecticide, which made her nauseous. (Tr. 128). Plaintiff alleged that exposure to the large quantities of insecticide caused her to develop multiple chemical sensitivity. Plaintiff began to develop skin rashes when exposed to perfume. (Tr. 128). Plaintiff also began to experience panic attacks in public places, and her skin began to "fall off in piles of skin flakes." (Tr. 128). Plaintiff first sought medical attention on September 11, 2000;[1] at which point Dr. Curtis Hedberg found Plaintiff had multiple chemical sensitivity, especially to perfume and smoke. Plaintiff was also found to suffer from anxiety. (Tr. 205). Dr. Hedberg advised Plaintiff that anxiety can cause multiple chemical sensitivity to worsen, and that Plaintiff should exercise and follow an elimination diet to identify any possible food allergies. (Tr. 206). Dr. Hedberg then prescribed Plaintiff Buspar for anxiety,15mg bid (twice daily), and instructed her to return to the clinic four weeks later to be re-evaluated for her anxiety. (Tr. 206).

On December 28, 2006, a General Physical Examination was conducted by C.R. Magness M.D., at the request of the Social Security Administration. (Tr. 224-230). At the time of the exam, Plaintiff was not taking any medications and was wearing a face mask as protection from contaminants. (Tr. 224-225). Plaintiff's alleged ailments at the time were: multiple chemical sensitivity; headaches; muscle and joint pain; and mental problems. (Tr. 204 224-230). Plaintiff was 5'1" tall and weighed 245 pounds. (Tr. 226). Plaintiff was found to have no motion limitations when not affected by contaminants. (Tr. 227). Plaintiff was also found to suffer from situational anxiety, and there was no evidence present of psychosis or serious mood disorder. (Tr. 226-229).

---

[1] Plaintiff alleged she was diagnosed with multiple chemical sensitivity in 1996. However, there is no medical record to support this assertion.

Dr. Magness diagnosed Plaintiff with multiple chemical sensitivity, exogenous obesity, and situational anxiety. (Tr. 230). He found that Plaintiff had mild limitations in her ability to walk, stand, lift and carry; and mild-moderate limitations in her ability to see, hear and speak when affected by contaminants. (Tr. 230).

On January 2, 2007, a Physical Residual Functional Capacity (RFC) Assessment was completed by a non-examining medical consultant, Dr. Bill F. Payne. (Tr. 231-238). Plaintiff was found to be able to occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk for about six hours in an eight hour work-day; sit for a total of about six hours in an eight hour work-day; and push and/or pull unlimited within the restriction of lift and/or carry. (Tr. 232). He further found that Plaintiff should avoid concentrated exposure to: fumes; odors; dusts; gases; and poor ventilation. (Tr. 235).

On January 19, 2007, a Consultative Mental Status and Evaluation of Adaptive Functioning examination was completed by Neuropsychologist Gene Chambers, Ph.D. (Tr. 242-246). Plaintiff alleged multiple chemical sensitivity, headaches, muscle and joint pain, and mental problems. (Tr. 242). Plaintiff was not on medication at the time of the appointment. (Tr. 243). Plaintiff had a spontaneous and well-organized stream of mental activity, and denied unusual experiences. (Tr. 244). Dr. Chambers diagnosed Plaintiff with Dysthymia and Generalized Anxiety Disorder, and stated Plaintiff's depression could be related to her limitations with chemical sensitivity, her loss of autonomy, and being unable to do more of what she would like. Dr. Chambers also stated that Plaintiff was able to communicate effectively, and showed no signs of unusual passivity, dependency, aggression, impulsiveness, or withdrawn behavior. (Tr. 244). Dr. Chambers further noted that Plaintiff was obese and opined this may cause some limitations. (Tr. 246).

On February 23, 2007, a Mental RFC was completed by a non-examining medical consultant, Dr. Kay M. Gale. (Tr. 263-265). Dr. Gale found Plaintiff was moderately limited in the ability to carry out detailed instructions, and to maintain attention and concentration for extended periods. (Tr. 263). Plaintiff was also found to have a moderately limited ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 264).

On March 20, 2007, Kristen Speer, MHPP (Mental Health Para-Professional), conducted an Initial Assessment at the Ozark Guidance Center. (Tr. 274-278, 304-331). Plaintiff attended regular therapy sessions from March 20, 2007, until August 6, 2007. (Tr. 197-202). Plaintiff stated in the initial visit that she knew she needed to lose weight but was scared to because people would think she was "available." Plaintiff also stated she wanted to be more independent and capable, but was very protective of her family. (Tr. 276, 275-278). On June 18, 2007, Ms. Speer noted that Plaintiff seemed less depressed, although she was still experiencing a great deal of anxiety related to her environmental sensitivity. (Tr. 309-310). On July 25, 2007, Plaintiff stated that she did not feel ready to make a change for herself and questioned whether she was being lazy again, not putting forth the needed effort, or just sliding along. (Tr. 321). On August 6, 2007, at the Ozark Guidance Center termination session, Ms. Speer noted Plaintiff continued to work on her health issues and attempted to lose weight within the limitations of her illness, which was and continued to be a restriction on much of her progress. (Tr. 330).

On May 22, 2007, a visit to the Northwest Arkansas Free Health Clinic was prompted after Plaintiff found blood in her urine. (Tr. 285). The attending physician found Plaintiff suffered from multiple chemical sensitivity; she was obese with a BMI of 47; she had bright red blood in her

urine; and a questionable hematuria. (Tr. 285).

On May 24, 2007, upon referral from the Northwest Arkansas Free Health Clinic, Plaintiff was seen at Washington Regional Medical Center for rectal bleeding; lower abdominal pain; and a gross hematuria. Images from inside the pelvic region were obtained, using a non-evasive procedure in which all observations were normal or unremarkable, with the exception of a single sigmoid diverticula without any evidence of diverticulitis, and degenerative changes of the lumbar spine with facet hypertrophy at L4-5 and L5-S1. (Tr. 288).

On June 6, 2007, Plaintiff was seen at St. Francis House complaining of chemical pneumitis and dermatitis. (Tr. 199, 293-295). The attending physician suggested use of antihistamines, and a further consultation with an allergist as treatment options. Plaintiff subsequently declined both options. (Tr. 199, 295).

On July 5, 2007, Plaintiff visited Northwest Arkansas Free Health Clinic, complaining of rashes all over her body. (Tr. 197-198, 332-348). The attending physician prescribed hydrochlorothiazide (HCTZ), 25 mg daily, with 6 refills for high blood pressure; and Prednisone, 20 mg daily, for 5 days. (Tr. 198, 334).

On July 31, 2007, Plaintiff visited Northwest Arkansas Free Health Clinic, complaining of bleeding upon excretion and lower left quadrant pain. (Tr. 197, 333). At the time, Plaintiff was taking HCTZ, 25 mg daily, Triamcinolone cream and Lamasil. (Tr. 197, 333). A vaginal exam was conducted with negative results. Plaintiff was instructed to continue her current medication. (Tr. 197, 333). The Plaintiff was seen for a follow up visit at the clinic August 21, 2007, and was instructed to remain on current medication. (Tr. 197, 332). A final examination of Plaintiff was conducted on September 18, 2007. The attending physician noted a rectal hemorrhoid tag, and all

other findings were normal. Plaintiff was once again instructed to continue with prescribed medication. (Tr. 197, 342).

In Plaintiff's functional report dated July 20, 2006, Plaintiff stated that on a daily basis, she was able to cook complete meals for herself, clean, do the laundry, wash the dishes, iron and vacuum. (Tr. 123). Plaintiff stated about every month or month and a half she would go to the grocery store for about an hour, and every three months she would go to the store to buy other household goods. (Tr. 124). Plaintiff also stated she was in the process of learning Marshallese. (Tr. 121).

At the hearing before the ALJ on August 11, 2007, Plaintiff stated she was unable to travel in a car with different people or by means of public transportation because of "fresh vinyl." (Tr. 20). Plaintiff also reported that although a doctor had suggested she take antihistamines, she failed to do so because she believed it would not have worked on her kind of allergies. (Tr. 27). Plaintiff further stated that since 2000, she had worn a mask that she believed helped her, although it had never been medically prescribed. (Tr. 16).

**Applicable Law**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnahrt, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists

in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258, F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274, F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for longer than at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filling her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her

residual functional capacity (RFC). See McCoy v. Schweiker, 683 F. 2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

**Discussion**

**A. Plaintiff's Impairments**

The ALJ found that the Plaintiff had the following severe impairments: Mood disorder with anxiety/adjustment features; multiple chemical sensitivity; hypertension; and obesity. However, he further found the Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. After reviewing the record and relevant listings, the Court believes there is substantial evidence to support the ALJ's conclusion that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.

**B. Plaintiff's Credibility**

The ALJ stated that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible, to the extent they are inconsistent with the RFC assessment. He then gave careful consideration to all of the relevant factors in making this determination. In Polaski v. Heckler, 739 F. 2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit Court of Appeals stated that the ALJ may discredit subjective complaints of pain if there are inconsistencies in the evidence as a whole. Id. The factors the ALJ is to consider when determining if Plaintiff's complaints of pain are credible include: the absence of an objective medical basis that supports the severity of the subjective complaints; Plaintiff's daily activities; the duration, frequency, and intensity of Plaintiff's pain; precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and functional restrictions. Id. If the ALJ discredits the testimony and explicitly gives good reason for doing so, the Court is bound by the ALJ's

judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); see also Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

Plaintiff claimed that when she was affected by multiple chemical sensitivity she would walk sideways, get confused, fall down and have blurred vision. Plaintiff further stated she became sick when exposed to car exhaust. However, in her functional report dated July 7, 2006, Plaintiff stated she drove to and from work daily, and she was able to drive to the grocery store, gas station, and restaurants. Plaintiff further testified at her hearing before the ALJ that she was able to drive to the park as well. Plaintiff stated in her functional report that she would sometimes ride in cars with others. However, Plaintiff later testified at her hearing before the ALJ that she was unable to ride in a car with different people or on public transportation because of the "fresh vinyl." (Tr. 120-128, 20). Plaintiff stated she would slur her speech and have hearing difficulty while affected by the chemicals. However, she also stated that she needed to call and talk to someone if the chemicals had really affected her that day, just to complain. Plaintiff stated throughout the record that multiple chemical sensitivity affected her memory, yet at the same time Plaintiff also stated she was teaching herself the Marshallese language. Finally, Plaintiff stated that stress would cause her multiple chemical sensitivity symptoms to increase. However, she also stated that she could usually take a lot of stress.

Plaintiff stated that in 1996 or 1997, she was already experiencing severe problems with multiple chemical sensitivity due to her exposure to insecticide some time in 1984, but she failed to seek treatment, and was not diagnosed with multiple chemical sensitivity until September 11, 2000. The record also reflects that during Plaintiff's visit with Dr. Hedberg on September 11, 2000, it was

discussed that anxiety could increase the severity of multiple chemical sensitivity side effects. Plaintiff was prescribed Buspar, an anti-anxiety medication, and was asked to return to the clinic a month later to re-evaluate her anxiety. There is no evidence in the record that Plaintiff ever returned to the clinic or took the recommended medication. Plaintiff did nothing more to address her anxiety until seven years later, on March 20, 2007, when she had an initial assessment at the Ozark Guidance Center, and her counseling visits lasted less than five months.

The failure to seek medical assistance or to follow prescribed treatment contradicts a claimant's subjective allegations of pain. Edwards v. Barnhart, 314 F.3d 964, 967-968 (8th Cir. 2003). Therefore, Plaintiff's actions with regard to her failure to pursue treatment or follow prescribed treatment support the ALJ's credibility findings.

The record reflects that on July 5, 2007, Plaintiff was prescribed HCTZ for hypertension and was instructed to continue the use of the medication at four subsequent medical appointments. If an impairment can be controlled by treatment or medication, it cannot be considered "disabling" for purposes of a disability benefits claim. Brown v. Asture, 611 F.3d 941, 955 (8th Cir. 2010).

Plaintiff's daily activities are also inconsistent with disabling pain. In a handwritten function report dated July 20, 2007, Plaintiff indicated she was able to make full meals for herself and groom herself on a daily basis. She was also able to clean her residence, do the laundry, shop at the grocery store, and attend church throughout the week. Plaintiff could also manage her bank account without any outside assistance, and was learning the Marshallese language.

The Court believes the ALJ considered all of the relevant factors required in Polaski and gave good reasons for discrediting Plaintiff's allegations of pain. Accordingly, the Court finds substantial evidence to support the ALJ's credibility findings.

**C. Residual Functional Capacity**

The ALJ found the Plaintiff had the RFC to perform medium-level activities with limitations. Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," the Eighth Circuit Court of Appeals has also stated that a "claimant's residual functional capacity is a medical question." Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003), quoting from Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace. Nevland v. Apel, 204 F.3d 853, 858 (8th Cir. 2000). In the present case, Dr. Payne found the Plaintiff was able to occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk about six hours in an eight hour work-day; sit about six hours in an eight hour work-day; and push and/or pull in an unlimited fashion, pursuant to limitations on lift/carry. Dr. Magness, who performed a physical examination of the Plaintiff on December 28, 2006, found the Plaintiff had mild limitations in her ability to walk, stand and lift, and mild to moderate limitations in her ability to see, hear and speak, when affected by chemicals.

A mental evaluation performed by Dr. Gene Chambers found the Plaintiff had a spontaneous and well-organized stream of mental activity, and the ability to communicate effectively and make herself understood. Dr. Chambers found no evidence of unusual passivity, dependency, aggression, impulsiveness or withdrawn behavior. The Plaintiff's concentration, persistence, and pace were found to be within the normal limits. A Mental RFC Assessment, performed by Dr. Gale, found Plaintiff was moderately limited in her ability to carry out detailed instructions, and to maintain

attention and concentration for extended periods. Dr. Gale further opined that Plaintiff was also moderately limited in her ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. The Plaintiff was not found to have marked mental difficulties in maintaining concentration, persistence, or pace, or to have repeated episodes of decompensation.

With respect to Plaintiff's obesity, the record reveals that she failed to list obesity in her claim for disability, and did not testify beyond the fact that at the time of the hearing before the ALJ, she was five foot one inch tall and weighed 225 pounds. Further, Plaintiff did not testify as to any limitations of her obesity. See Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2006) (holding that a social security claimant waived on appeal his claim that the ALJ failed to consider his morbid obesity as an impairment, where he never alleged any limitation in function as result of obesity in his application for benefits or during the hearing).

The ALJ considered the medical assessments of the agency examining and non-examining medical consultants, the medical records from the various physicians seen by Plaintiff, and Plaintiff's subjective complaints. Plaintiff's capacity to perform this medium level of work was supported by the fact that Plaintiff's treating and examining physicians placed no restrictions on her activities that would preclude her from performing the RFC determined. See Hutton v. Apel, 175 F.3d 651,655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of total disability). Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination.

**D. Hypothetical Question Proposed to Vocational Expert**

The ALJ proposed the following hypothetical question to the VE:

> Let's assume the Claimant has demonstrated an ability to perform work at a medium exertional level, to lift and/or carry fifty pounds occasionally , and lift and/or carry twenty-five pounds frequently. Able to sit for six out of eight hours. Stand and/or walk six out of eight hours. With no more than superficial contact incidental to work with the public and co-workers, and supervision which is concrete, direct and specific. Would that limitation of no more than superficial contact incidental to work with the public and co-workers have any impact on home health aide?

(Tr.34). In response to the hypothetical, the VE stated the claimant would not be able to perform her past work as a home health aide or housekeeper. The ALJ followed up with a second hypothetical:

> Let's take a hypothetical individual of the same age, work experience, education as our claimant, and the same RFC. We want to avoid excessive extreme heat, what would be available at the medium level?

(Tr.36). The VE responded that there would be work available at a light level, such as a hand packer, or an electronics assembler, but that nothing would be available at the medium level. The ALJ followed with a final hypothetical:

> If we were to add some additional limitations that secondary to fatigue, any nausea, any psychologically based problems that our hypothetical individual would need extra breaks from one to one and a half hours on a regular and continuing basis in a work-day, what would that do?

(Tr. 40). The VE responded that it would be unlikely that an individual would be able to retain competitive employment if accommodations were not extended to the individual from the employer. The ALJ then asked about missing work and leaving work early on a regular basis, to which the VE responded that while it would not compromise someone's ability to get work, it would affect their ability to simply retain work. Although the VE determined Plaintiff would not be able to perform past relevant work, the VE testified that Plaintiff would be able to perform the requirements of representative unskilled occupations such as hand packer and electronics assembler.

After throughly reviewing the evidence of record, the Court finds that the hypothetical the ALJ posed to the VE fully set forth the impairments which the ALJ accepted as true, and which were supported by the record as a whole. See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Following thorough review, the Court finds substantial evidence to support the ALJ's determination that Plaintiff could perform work as a hand packer and an electronics assembler.

**Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and affirms ALJ's decision. Plaintiff's complaint is dismissed with prejudice.

IT IS SO ORDERED this 5th day of July 2011

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE